IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOME LOAN CENTER, INC., d/b/a LENDINGTREE LOANS, Plaintiff, vs. ALTHEA FLANAGAN a/k/a ALTHEA FLANAGAN-SEELS a/k/a ALTHEA SEELS, DUANE K. SEELS, THOMAS L. KIRSCH & ASSOCIATES, P.C., SUZETTE DAVIS-YOUNG, and SUE GONZALEZ, Defendants. | Case No. 10 C 6787 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Home Loan Center, Inc., d/b/a LendingTree Loans (LendingTree), has sued Althea Flanagan, Duane K. Seels, Thomas L. Kirsch & Associates, P.C. (Kirsch & Associates), Suzette Davis-Young, and Sue Gonzalez. LendingTree asserts claims of fraud against both Flanagans and negligence against Kirsch & Associates, Davis-Young, and Gonzalez. The Court has jurisdiction based on diversity of citizenship. Kirsch & Associates has moved for summary judgment, as have Davis-Young and Gonzalez. For the reasons stated below, the Court denies the motions.

### Background

Because the defendants have moved for summary judgment, the Court views the evidence in the light most favorable to LendingTree, the non-moving party.

In 2007, LendingTree approved two loans, in the amounts of $224,900 and $75,000, for the purchase of a home in Munster, Indiana. LendingTree took the loan applications over the phone. The applicant claimed that he was Henry Flanagan. Flanagan says that he did not seek any loans from LendingTree and that his daughter Althea Flanagan stole his identity. LendingTree contends that Althea and her husband Seels actually made the loan applications. The applicant(s) made numerous misrepresentations, including misstating Flanagan's income and employment. The loan application stated that Flanagan owned a cleaning and lawn care business, but in fact he had been retired since 1985.

LendingTree attempted to verify some of the information that it received. It called Flanagan's purported place of business and left a message for him. Someone claiming to be Flanagan called LendingTree back. Althea Flanagan also faxed documentation related to the loan to LendingTree, claiming that she was doing so on behalf of her father. As part of its investigation, LendingTree received a letter that was purportedly from KSC Business Support Services. The letter stated that Flanagan owned his own business and had a monthly income of $8,000. LendingTree's file on Flanagan's loans also contains verification from a LexisNexis database that *KSC* was a real business. The file does not, however, contain any similar verification about Flanagan's business. In May 2007, the house in Munster was appraised and valued at $305,000, and LendingTree approved the loan applications on June 15, 2007.

The closing for the home purchase took place on June 27, 2007. It began at the offices of attorney Lee Newell in Calumet City, Illinois. Newell acted as an attorney for Flanagan. The closing agent was Kirsch & Associates, and Thomas Kirsch (Kirsch), the

firm's principal, and two of its employees, Gonzalez and Davis-Young, were present. Davis-Young acted as a notary. Kirsch also acted as the attorney for the sellers. Also present were the sellers; Althea Flanagan; and a man claiming to be Henry Flanagan. Henry states that he was not at the closing, and LendingTree contends that the man who claimed to be Flanagan at the closing was in fact Seels. No representative from LendingTree attended the closing. LendingTree states that it never attends closings and relies on the closing agent and notary to meet the borrower in person, and it contends that this is common in the mortgage business.

During the closing, the man claiming to be Flanagan could not produce any identification, as was needed before he signed the loan documents. He claimed to have forgotten his driver's license and said that he would return home to get it. The parties to the sale agreed that it would be easier for him to bring his identification to Kirsch's office in Indiana.

Several hours later, the man claiming to be Flanagan arrived at Kirsch & Associates' office in Munster, Indiana. Kirsch, Gonzalez, and Davis-Young all looked at the license the man presented, which was in the name of Henry Flanagan. The picture on it showed a bald man without any facial hair, and the license stated that Flanagan's birthdate was in 1925, which would have made him eighty-one at the time of the closing. Gonzalez thought that the man presenting the license looked about thirty-five, and Kirsch noted that the man had a full head of hair and a full beard. Gonzalez told Kirsch that she did not think the license belonged to the man who claimed to be Flanagan. Kirsch asked the man why he had no hair in his license picture. The man replied that he had previously had cancer but was recovering. Both Davis-Young and Kirsch

3

thought that the man claiming to be Flanagan looked younger than eighty but that he was not a young man. Kirsch estimated the man was seventy, and Davis-Young remembered that he had a cane. Kirsch attempted to verify that the man claiming to be Flanagan was who he said by asking him several questions about the loan documents. When the man answered the questions correctly, the Kirsch & Associates personnel were convinced, they say. The man signed the loan paperwork, and Davis-Young notarized it.

Kirsch then faxed the closing documents and a photocopy of Flanagan's driver's license to Holly Hare, a LendingTree representative. Kirsch did not indicate to LendingTree that the man claiming to be Flanagan looked significantly different from the picture on the driver's license. Having received the documents, Hare funded the loans and directed Gonzalez to disburse to the sellers the loan proceeds, which had been held in escrow.

After the closing, Althea Flanagan and Seels lived in the Munster house. Henry Flanagan remained in his home in Chicago. Someone executed a deed in Henry's name purporting to transfer the Munster house to Althea. Henry denies that he executed the deed.

In July 2007, LendingTree sold its rights under the loans and its mortgages to other banks. Specifically, it sold the $224,900 senior loan to Countrywide Home Loans and the $75,000 loan to Wells Fargo.

On January 27, 2009, Countrywide notified LendingTree of problems with the loan it had purchased. Countrywide stated that Henry Flanagan had reported that Althea Flanagan had stolen his identity and used it to obtain the loan without his

4

knowledge. When Countrywide received notice of these allegations, it audited the loan and learned that the applicant had misstated Flanagan's income and employment. As a result of these misstatements, Countrywide demanded that LendingTree repurchase the loan, as the contract between the two lenders required. Countrywide also began proceedings to foreclose its mortgage in early 2009.

Wells Fargo sent LendingTree a similar notice on May 29, 2009. Wells Fargo stated that there was significant evidence that Flanagan did not live in the house in Munster, contrary to what the loan application had stated. The evidence included the fact that public records showed that Flanagan still lived in Chicago; public records showed that Althea Flanagan lived at the house in Munster; Flanagan had submitted an identity theft affidavit stating he had lived at his Chicago residence for nearly fifty years; and in a Munster police report, Flanagan claimed that Althea had stolen his identity and bought a house with it. Wells Fargo demanded that LendingTree repurchase the loan because the loan documentation had falsely stated that Flanagan would live in the Munster house.

Together, Countrywide and Wells Fargo demanded that LendingTree pay them more than $325,000 to repurchase the loans. LendingTree did not dispute that it was required to repurchase the two loans. Robert Kaiser, LendingTree's impaired asset manager, decided that it was preferable to settle with the banks instead of repurchasing the loans. LendingTree paid Countrywide $40,213.32 and Wells Fargo $40,765.36, and the banks kept the loans and mortgages.

## Discussion

On a motion for summary judgment, the Court "view[s] the record in the light

5

most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

LendingTree contends that the Kirsch law firm, Gonzalez, and Davis-Young are liable for negligence. When "none of the parties raise[ ] the choice of law issue, [the Court] appl[ies] the substantive law of Illinois, the forum state." *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). LendingTree and Kirsch do not contest that Illinois law applies in this case. The individual defendants do not discuss choice of law, but in their opening brief they cite decisions by Indiana courts. In their reply brief, however, the individual defendants appear to accept LendingTree's contention that Illinois law applies, because they cite no Indiana court decisions but instead discuss the elements of negligence as established in Illinois law. The Court therefore applies Illinois law. *See NPF WL, Inc. v. Sotka*, 99 C 7966, 2000 WL 574527, at *6 (N.D. Ill. May 10, 2000) (when party cited Ohio and other foreign law but did not explain why foreign law applied, court assumed that parties did not dispute that Illinois law applied).

Illinois law requires a plaintiff asserting a negligence claim to prove facts that establish the existence of a duty; breach of the duty; and injury proximately caused by the breach. *Camp*, 553 F.3d at 505–06. The defendants make a variety of arguments,

6

which the Court will consider in turn.

## A. Standing

The individual defendants argue that LendingTree lacks standing to sue. They appear to argue that because LendingTree cannot challenge the validity of the mortgages because it is neither the mortgagor nor the current mortgagee. Defendants cite no authority supporting this argument, and in any event, LendingTree is not challenging the validity of the mortgages. Rather, it contends they are enforceable against whoever signed as Henry Flanagan.

"Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts, and a judicial decision in the plaintiff's favor would redress the injury." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011). LendingTree suffered an injury when it paid Countrywide and Wells Fargo more than $80,000 to avoid what it argues would have been an even greater loss if it had to repurchase the loans, and a judgment against the defendants would redress this injury. The Court will address causation as an element of negligence below, but for standing purposes, LendingTree need only have a colorable claim of causation. *Id.* at 1025. LendingTree's contention that its settlement was caused by defendants' negligence because it otherwise would not have funded the loans is in fact colorable.

## B. Duty

Kirsch & Associates argues that it owned no duty to LendingTree to guard against allowing an imposter to sign the closing documents. The existence of a duty is a question of law. *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724, 935 N.E.2d 644, 655 (2010).

Kirsch & Associates initially argued that because it was the attorney for the seller of the property it owed no duty to LendingTree. It is undisputed, however, that Kirsch & Associates was also the closing agent or escrow agent for the transaction. Under Illinois law, "[e]scrowees have been found to owe a fiduciary duty both to the party making the deposit and the party for whose benefit it is made. . . . [T]he escrowee owes a duty to act only in accordance with the escrow instructions." *Int'l Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 123, 806 N.E.2d 1166, 1172 (2004). In this case, the escrow instructions stated that "[e]ach Borrower must sign all documents exactly as his or her name appears on the blank line provided for his or her signature. All signatures must be witnessed if required or customary. All signature acknowledgments must be executed by a person authorized to take acknowledgments in the state of closing." Pl. Supp. Ex. A at 2. This language suggests that Kirsch, as the escrow agent, was required to verify that it was actually the named borrower who signed the documents. *See Guar. Residential Lending, Inc. v. Int'l Mortg. Ctr., Inc.*, 305 F. Supp. 2d 846, 865 (N.D. Ill. 2004) (escrow agent had a duty to determine whether imposters were signing closing documents as borrowers, who were deceased, when escrow instructions required witnessed and acknowledged signatures and contained an addendum requiring valid identification).

It does not appear that any Illinois case has yet held that an escrow agent has a general duty to exercise reasonable care in conducting a closing, including disbursing funds to the proper party or parties and notifying the parties to the escrow of potential fraud. The Court concludes, however, that the Illinois Supreme Court would impose such a duty. *See Rennert v. Great Dane Ltd. P'ship*, 543 F.3d 914, 917 (7th Cir. 2008)

8

(federal court sitting in diversity must apply Illinois law as Illinois Supreme Court would apply it).

Under Illinois law, "[t]he touchstone of [a] court's duty analysis is to ask whether a plaintiff and a defendant stood in such relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436, 856 N.E.2d 1048, 1057 (2006). The Illinois Supreme Court "often discusses the policy considerations that inform this inquiry in terms of four factors: (1) the reasonable foreseeability of the injury[;] (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *Id.* at 436–37, 856 N.E.2d at 1057.

These factors weigh in favor of a conclusion that an escrow agent like Kirsch & Associates owes a duty to the parties to the escrow to exercise reasonable care in supervising the closing, verifying the identity of the borrower and notifying the parties to the escrow of potential fraud, and disbursing funds appropriately. If the escrow agent does not take steps to verify the identities of persons to whom it is to disburse funds, injury to a lender such as LendingTree is both foreseeable and likely. LendingTree contends, and Kirsch does not dispute, that it is standard in the mortgage business for lenders not to attend closings themselves but instead to rely on the closing agent to supervise the closing and ensure it is conducted appropriately. Further, the burden and consequences of imposing such a duty on closing agents is not particularly high. *Cf. Northcutt v. Chapman*, 353 Ill. App. 3d 970, 977, 819 N.E.2d 1180, 1188–89 (2004) (refusing to place burden on lenders to refuse to loan money to unlicensed and

9

incompetent individuals seeking to purchase motor vehicles because the consequences would be substantial). An escrow agent already has a duty to follow the escrow instructions and can be liable for not recognizing identity theft or disbursing money incorrectly. *See Guar. Residential Lending*, 305 F. Supp. 2d at 865; *Int'l Capital Corp.*, 347 Ill. App. 3d 124–26, 806 N.E.2d 1166, 1172–74 (escrow agent was liable for disbursing funds to seller when transaction was not completed, because escrow instructions told agent to hold money for benefit of parties).

Further, other states that determine the existence of duties in way similar Illinois and that, like Illinois, impose a duty on escrow agents to follow the escrow instructions have required escrow agents to reasonably supervise the closing or inform the parties to the escrow of potential fraud. *See, e.g., Fla. Bar v. Hines*, 39 So. 3d 1196, 1200 (Fla. 2010) (escrow / closing agent has duty to supervise closing in a reasonably prudent manner and to exercise reasonable skill and ordinary diligence in disbursing escrowed funds); *Meridian Title Corp. v. Pilgrim Fin., LLC*, 947 N.E.2d 987, 988–90, 992 (Ind. App. 2011) ("an escrow or closing agent's fiduciary duties include the responsibilit[y] . . . to exercise ordinary skill and diligence"); *Kirk Corp. v. First Am. Title Co.*, 270 Cal. Rptr. 24, 37 (Cal. App. 1990) (escrow holder has duty to exercise ordinary skill and diligence and owes implied obligation "to do all of the things normally done by an escrow agent which were not expressly excluded by the escrow instructions."); *A Good Time Rental, LLC v. First Am. Title Agency, Inc.*, 259 P.3d 534, 538 (Colo. App. 2011) (escrow agent must "disburse net proceeds with reasonable care and competence"); *Waffen v. Summers*, 2009 Ohio 2940, ¶¶41–42 (Ohio. Ct. App. 2009) (escrow agent who has expressly disclaimed fiduciary duty must nonetheless exercise reasonable care in

disbursing funds); *Maxfield v. Martin*, 173 P.3d 476, 478 (Ariz. App. 2007) (escrow agent owes fiduciary duty to principal to comply with escrow agreement and "to disclose facts that a reasonable escrow agent would perceive as evidence of fraud").

In *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978 (N.D. Ill. 2010), another judge in this district stated that "[a]ny duty owed by [defendants] in their capacity as closing agents must derive from the closing instructions, and not generally from law and industry standards." *Id.* at 992. To support this proposition, the court cited the Illinois appellate court's decision in *Bescor, Inc. v. Chicago Title & Trust Co.*, 113 Ill. App. 3d 65, 446 N.E.2d 1209 (1983), in which the court stated that "an escrowee . . . owes a fiduciary duty to act only according to the terms of the escrow instructions." *Id.* at 69, 446 N.E.2d at 1213. The fact that an escrow agent must follow the closing instructions, however, does not preclude the existence of duties derived from other sources. Further, *Freedom Mortgage* is distinguishable from the current case. There, the court decided on a motion to dismiss that the plaintiff had adequately alleged a violation of the closing instructions. Thus the court did not need to determine whether the closing agents owed the plaintiff any other duty. *Freedom Mortg.*, 720 F. Supp. 2d at 991–92.

The Court concludes that Kirsch owed LendingTree a duty of ordinary care in supervising the closing and verifying identities and notifying LendingTree of circumstances indicating fraud.

**C.    Breach**

Kirsch argues that it did not breach any duty to LendingTree by failing to notify LendingTree of the suspicious circumstances regarding the man claiming to be

11

Flanagan. There is sufficient evidence from which a reasonable fact finder could conclude that Kirsch breached its duty. This is not a close question.

It is undisputed that the man claiming to be Flanagan could not produce any identification at the closing. Rather, he left and was only able to present identification several hours later. As previously detailed, there were rather obvious differences between the photo and information on the identification the man presented and his actual appearance. Despite these discrepancies, Kirsch & Associates personnel allowed the man to sign the closing documents and, just as importantly, did not advise LendingTree of the suspicious circumstances. A reasonable jury could conclude that Kirsch acted unreasonably and breached the duty it owed to LendingTree.

**D.    Proximate causation**

All defendants argue that LendingTree cannot show proximate cause. "Proximate cause encompasses both cause in fact and legal cause. To establish cause in fact, the plaintiff must show the defendant's conduct was a material element and a substantial factor in bringing about the injury." *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) (internal quotation marks and citations omitted). "A defendant's conduct is a material element and a substantial factor in bringing[ ] about an injury if, absent that conduct, the injury would not have occurred." *Elliott v. Williams*, 347 Ill. App. 3d 109, 114, 807 N.E.2d 506, 510 (2004). "Legal cause on the other hand, is essentially a question of foresee-ability [sic], and [a court] must determine whether the injury is of a type that a reasonable person would see as a *likely result* of his or her conduct." *Blood*, 668 F.3d at 546 (emphasis in original; citation and internal quotation marks omitted).

The defendants argue that LendingTree cannot show that their negligence proximately caused LendingTree's damages. Their first argument is that LendingTree had approved the loans to Flanagan before closing. Perhaps so, but it did not disburse any of the funds until it received the signed closing documents from Kirsch. Hale, LendingTree's representative, testified that she would not have approved funding the loans if the closing agent had advised her that there was doubt that the borrower was actually who he claimed to be. Pl. Ex. 3 at 118. She said that she would have referred the matter to a loan processor so that LendingTree could "get to the bottom of it." *Id.* A reasonable jury could believe her testimony and conclude that LendingTree would not have funded the loans had it known there were circumstances calling into question the identity of the man claiming to be Flanagan.

Defendants also argue that LendingTree's damages were caused by its decision to settle the repayment demands by Countrywide and Wells Fargo. But a reasonable fact finder could conclude that LendingTree would never have gotten to this point had defendants informed LendingTree of the suspicious circumstances involving the man claiming to be Flanagan.

A reasonable jury could also conclude that the injury LendingTree suffered was foreseeable. Defendants contend that LendingTree's damages stem from the lies on the loan applications because, they claim, that was the basis on which Countrywide and Wells Fargo demanded repurchase of the loans. But the jury could conclude that it was foreseeable that LendingTree would suffer damages from the fact that someone obtained loans by impersonating Flanagan and the fact that defendants failure to take actions that would have prevented the fraud from succeeding. The exact lie by the

13

imposter told that ended up costing LendingTree money need not be foreseeable. *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 556, 836 N.E.2d 640, 657 (2005) (damage to inner ear was foreseeable from detaching middle ear bone, even though injury was caused by blood leakage and not more common penetration of inner ear); *Elliott*, 347 Ill. App. 3d at 114–15, 807 N.E.2d at 510–11 (company's failure to discover security guard's criminal record was proximate cause of his assault on plaintiff, even though plaintiff had voluntarily opened the door to the guard).

Finally, a reasonable jury could find that defendants caused LendingTree's loss even though it settled the repurchase demands. There can be more than one proximate cause of an injury. *Elliott*, 347 Ill. App. 3d at 113, 807 N.E.2d at 510. In any event, LendingTree had the choice to pay more than $325,000 to repurchase the loans, which were already in foreclosure and secured by property that arguably was worth less than the amounts due, or to reach a compromise and settle for less than the total the banks demanded. A reasonable fact finder could decide that LendingTree would have suffered a loss no matter what choice it made.

Finally, Kirsch & Associates contends that, at most, it created a condition under which LendingTree could later suffer damages, which does not amount to probable cause. "If a defendant's breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 405-06, 821 N.E.2d 1099, 1133 (2004). As the court made clear in *City of Chicago v. Beretta U.S.A.*, however, the key question is foreseeability: if the purportedly intervening cause is foreseeable, it does not break

the causal chain. *Id.* at 406–07, 1134–35. Because a reasonable jury could find that it was foreseeable that the holders of the loans would insist that LendingTree repurchase them once the fraud was discovered, Kirsch & Associates' argument does not entitle it to summary judgment.

E. **LendingTree's negligence**

Kirsch & Associates contends that LendingTree was negligent in taking loan applications over the phone and failing to properly verify the statements on the loan applications and that this caused any injury that it suffered. "Under Illinois law, . . . an injured party is barred from recovering only if the trier of fact finds that his conduct was more than 50% of the proximate cause of the injury for which recovery is sought." *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 313 (7th Cir. 2010); *see* 735 ILCS 5/2-1116. Kirsch & Associates may have a viable contention that LendingTree was negligent in its own right, but it has not established as a matter of law that LendingTree was more than fifty percent responsible for its injury. As is usually the case, "the question of contributory negligence is a question of fact for the jury." *Basham v. Hunt*, 332 Ill. App. 3d 980, 995, 773 N.E.2d 1213, 1226 (2002).

F. **Failure to mitigate**

Kirsch contends that LendingTree failed to mitigate its damages by settling the repurchase demands rather than buying back the mortgages. Failure to mitigate is an affirmative defense on which Kirsch & Associates bears the burden of proof. *Washington Courte Condo. Ass'n-Four v. Washington-Golf Corp.*, 267 Ill. App. 3d 790, 822, 643 N.E.2d 199, 220 (1994).

Kirsch argues that because the Munster house was appraised at $305,000 in

2007, LendingTree would have suffered no damage had it simply repurchased the loans and mortgages. The Court disagrees. It is undisputed that Countrywide and Wells Fargo demanded that LendingTree pay more than $325,000 to repurchase the loans, which is more than $305,000. And even if LendingTree had repurchased the loans and mortgages and then foreclosed, it would have incurred expenses to do that. Finally, there is no basis in the record to conclude that the property could have been sold in 2009 for the same amount at which it had been appraised in 2007.

The duty to mitigate imposes on an injured party a duty of reasonable diligence and ordinary care in attempting to minimize its damages. *See Amalgamated Bank of Chicago v. Kalmus & Assocs.*, 318 Ill. App. 3d 648, 658, 741 N.E.2d 1078, 1086 (2000). A reasonable jury could conclude that LendingTree satisfied this obligation when it settled with the banks rather than repurchasing the mortgages. Kaiser, who investigated the repurchase demands for LendingTree and decided to settle with the banks, testified that he concluded that there had been fraud in the loans. Pl. Ex. 12 at 95. He stated that for this reason, it would have been more costly for LendingTree to repurchase the loans and assume the expense and legal fees of foreclosing on the property and attempting to sell it afterwards than to simply settle with Countrywide and Wells Fargo. *Id.*

**G.    Damages**

The individual defendants contend that LendingTree suffered no damages, arguing that when it settled the repurchase claims, LendingTree received exactly as much value as it paid to the banks. Essentially, the defendants argue that when LendingTree paid approximately $81,000 to settle the repurchase claims against it, it

16

received $81,000 worth of "release from possible litigation."  Indiv. Def. Reply at 6, 8.

The individual defendants cite no authority to support their argument that money a plaintiff has paid to settle claims against does not constitute damages.  Accepting defendants' argument would mean that any time a defendant's negligence causes a plaintiff to pay out of its own pocket to settle claim by a third party, the plaintiff cannot sue the defendant because it gets equivalent value from an economic standpoint.  This makes no sense.  A reasonable jury could find that had it not been for the defendants' negligence, Countrywide and Wells Fargo never would have been able to assert repurchase claims that required LendingTree to litigate or settle.

## H. Opposing positions

The individual defendants argue that LendingTree's negligence claim requires it to argue that the mortgages are invalid, even though it has taken the position that the mortgages were valid.  As discussed above, LendingTree does not take the position that the mortgages were invalid.  Rather, it says the mortgages are enforceable against whoever signed as Henry Flanagan.  Additionally, the defendants have cited no authority or articulated any legal theory under which the fact that LendingTree has taken arguably inconsistent positions requires the Court to grant summary judgment in defendants' favor.  *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

If defendants are attempting to make a judicial estoppel claim, they have presented no evidence to satisfy the elements of that claim.  "Judicial estoppel provides that when a party prevails on one legal or factual ground in a lawsuit, that party cannot

17

later repudiate that ground in subsequent litigation based on the underlying facts." *Urbania v. Cent. States, Southeast & Southwest Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005). The record does not reflect that LendingTree has prevailed in litigation based on a contention that the mortgages were valid.

**I.     Statute of limitations**

The individual defendants contend that LendingTree's claims are time-barred. The parties agree that the limitations period for a negligence claim is two years, *see* 735 ILCS 5/13-202, and that the discovery rule determines when the limitations period began to run. "Under the discovery rule, a cause of action accrues, and the limitations period begins to run, when the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused." *Clark v. Children's Mem'l Hosp.*, 955 N.E.2d 1065, 1089 (Ill. 2011) (internal quotation marks omitted); *accord Nelson v. Sandoz Pharms. Corp.*, 288 F.3d 954, 966 (7th Cir. 2002) (Indiana discovery rule asks when "plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another").

LendingTree filed the current suit on October 21, 2010. Defendants do not dispute that LendingTree did not actually learn that the mortgages were likely fraudulent until it received notice from Countrywide on January 27, 2009, less than two years before it filed suit. Instead, defendants argue that LendingTree should have learned of the problems with the loans in July 2007. LendingTree received the loan documents on July 2, 2007, after the closing. LendingTree had a policy of checking the signatures on the closing documents against all of the signatures it has on file for the loan. Defendants claim that the signatures of the name Henry Flanagan on the purchase

agreement, of which LendingTree had a copy in its file, are obviously different from the signatures on the closing documents and Flanagan's driver's license.

There is a genuine factual dispute, however, regarding whether the signatures on the purchase agreement and the closing documents were so dissimilar that LendingTree reasonably should have known in July 2007 that some of the documents had forged signatures. Defendants do not indicate which signatures they believe clearly do not match. The purchase agreement contains eight signatures and the attached money order has another one. Indiv. Def. Ex. H at 3–11. The closing documents contain four signatures and the license has another that is partially cut off. Indiv. Def. Ex. I at 4, 15, 27, 30, 34; Indiv. Def. Ex. J. The signatures on the documents vary, but defendants have provided no evidence that establishes that a reasonable fact finder would have to conclude that the signatures look so different that LendingTree ought to have concluded that they were made by different people. Indeed, defendants argue that the signature on the driver's license is the same as that on the closing documents, a fact that suggests that LendingTree had no reason to think that the signatures were aberrant or that there had been any fraud. For these reasons, and given the fact that none of the individuals at the closing reported any of the suspicious circumstances that existed, a reasonable jury could find that LendingTree's claim did not accrue until it received notice from Countrywide demanding repurchase of the mortgage.

### J. Vicarious liability

LendingTree contends that Kirsch & Associates is vicariously liable for the actions of its employees, Davis-Young and Gonzalez. Kirsch & Associates does not contest that it is vicariously liable for the actions of Gonzalez, but it argues that it is not

19

liable for the actions of Davis-Young as a notary.

Illinois law provides:

> The employer of a notary public is also liable to the persons involved for all damages caused by the notary's official misconduct, if:
> (a) the notary public was acting within the scope of the notary's employment at the time the notary engaged in the official misconduct; and
> (b) the employer consented to the notary public's official misconduct.

5 ILCS 312/7-102. The Illinois Supreme Court has explained that the statute requires that a notary's employer have some knowledge of the notary's misconduct before it can be liable. *Vancura v. Katris*, 238 Ill. 2d 352, 378–80, 939 N.E.2d 328, 344–46 (2010). Given Thomas Kirsch's own participation in the process of supposedly verifying the identity of the man who signed as Henry Flanagan, a reasonable jury could find Kirsch & Associates had knowledge of Davis-Young's misconduct.

**Conclusion**

For the reasons stated above, the Court denies defendants' motions for summary judgment [docket nos. 57 & 68]. The case is set for a status hearing on April 12, 2012 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                           United States District Judge
```

Date: April 2, 2012